May it please the Court, Mark Kubinski, Deputy Attorney General, State of Idaho. The issue on appeal is whether the PLRA, or whether under the PLRA, a party may recover attorneys' fees for a completely unsuccessful post-judgment contempt motion. Counsel, I am not so sure it should be viewed as completely unsuccessful. I know that the contempt motion did not result in an order to show cause. However, the way it came about was the state had brought the prisoners back and housed them in violation of the decree. The class action plaintiff's lawyers requested compliance, and the state said, well, we'll give you compliance by March, a couple of months down the road. Then the plaintiff's class action lawyers filed a motion for an order to show cause, and lo and behold, there's compliance in a couple of weeks instead of a couple of months. So it looks as though the motion did bring about a result. What's more, it seems to me very analogous to the situation that occurs all the time in civil litigation, where a party does not respond to a request for production, does not respond to a phone call saying, when are you going to produce, does not respond to a letter saying, you're already two, three months late on a request for production, how about it? And then there's a motion to compel and for sanctions under Rule 37, and there's immediate compliance with the request for production. The motion there was not a waste of time or unsuccessful. The motion was totally successful. This seems analogous to me. What am I missing here? Well, I would disagree, Your Honor, on two fronts. First of all, it's our position that the motion was, in fact, unsuccessful. There were three forms of relief that the plaintiff class asked for. The beds to be vacated by February 4th. They were vacated five days prior to that date. They asked for permanent removal of the bunks. The court denied that sanction. They also asked for $5,000 per day of sanctions. The court denied all three of that requested relief. So on the face and in the record, the motion was unsuccessful. As to the latter point about whether or not the filing of the motion motivated the defendants to be more expeditious in vacating the beds, we, again, would disagree with that. The defendants contacted the court and plaintiff's counsel on the first business day after the riot, advised them of what was occurring, and that they were already underway in vacating the beds. At the time that the motion to contempt was filed, approximately two weeks later, the beds were already 25% vacated. So there was nothing that the plaintiff's counsel had done that was motivating the defendants or the Board of Correction to vacate the beds. They were already doing that under their own initiative. Why isn't there a fair inference from the timing and from the state's letter saying they would be in compliance by March that it was the motion that sped up the compliance? Well, the state's, I think the record supports that the state's position all along was March 1 was what the target deadline was, but they also indicated that to the extent they could get those beds vacated sooner, they would. There were a number of circumstances. That wasn't what anything the court said. What the court had said in a decree was don't do that in the first place. Correct. But bringing the prisoners back and housing them as the state did violated the decree. It's not as though the court said you have until a later time. Well, I think the district court understood that there were a number of factors outside of the board's control and wanted to allow the board some flexibility in getting those beds vacated. I don't recall that the state came to the court before bringing the prisoners back from Texas or wherever they were and said to the court, we've got all these prisoners coming. We're going to need a little flexibility. And the court said, oh, I understand you need a little flexibility. The way I understand it is there's a decree saying don't house the prisoners that way. The state decides to save some money that it's giving the private prison in Texas by bringing the prisoners back. The court doesn't know anything about it. The state violates the decree. The court still doesn't know anything about it. And the defendant pretty much blows off the plaintiff's orders when they complain about it. And then when they bring a motion, when it finally gets to court, the court says after the fact, well, I don't think you did it with an intention to violate the decree. I think it just sort of happened. And you did your best to get back into compliance pretty soon. Have I misunderstood the facts? No, Your Honor, but I did want to comment on just a couple of those points raised by Your Honor. The state would disagree that the state blew off the plaintiff's counsel. Again, their actions to reduce those bed populations were underway from the very first day after the riot occurred. Also, going back to the court's earlier comments about whether or not the motion was the motivating cause to speed up the drawdown of the beds, I think that that type of an argument is undercut by Buckhannon and the PLRA itself, and that you have to achieve some sort of success on that motion. The problem with your Buckhannon argument is that the Supreme Court in Buckhannon did not overrule, what was it, Delaware River Valley or something like that, that said monitoring costs are okay. And here the judge said, I've appointed these people to monitor, and it was reasonable to bring the motion. But the distinction in Delaware Valley was that for those monitoring activities, and specifically the issue was whether they were entitled to fees for monitoring activities or defending collateral actions, they achieved some success in those proceedings and therefore were entitled to an award of fees. All of the cases for which we cite, there was at least some partial success by the defendants in their post-judgment monitoring that entitled them to an award of fees. Well, let me read you Judge Windmill's finding and tell me what you make of this. This is Judge Windmill's order. Plaintiffs played a key role in monitoring and working with the IDOC to resolve the overcrowding issue. Is that just the figment of his imagination, or is there no basis for it, or what? With all due respect to Judge Windmill, it's our position that that statement isn't sufficient under Hensley or any other cases in justifying the award of fees. The fact that he says a key role, he doesn't cite any specific instances in which plaintiffs caused that overcrowding to be eliminated. And so we would submit that Judge Windmill's finding. So you're saying it's not sufficiently specific or that if it's true, he's still not, they're still not entitled to fees? Both, Your Honor. First of all, factually, it's the defendants. So would you have us, on the specificity, would you have us tell him to go back and to spell out exactly what it was, and then once it's enumerated, you're in business? Well, Your Honor, before we got to that point, we would request that the court remand the case back to Judge Windmill to vacate that portion of the fee award related to the contempt proceedings. We're not talking about the contempt proceedings. We're talking about the key role in monitoring and resolving the overcrowding. He's talking the monitoring issue. Well, as we've set out in our brief, although it's not, it's our position that they were never appointed as monitors, but our issue on appeal is more focused to the contempt motion, and whether or not. It's not the specificity. It's that they can't get them at all. Even if the judge had listed day by day, minute by minute, what they had done, that still wouldn't satisfy you. That is correct. And that's because of the PLRA, which requires that those fees be incurred directly in enforcing the relief. And when they did not prevail at all on that motion, they could not have been deemed to have enforced the relief as a matter of law. So if we agree with you, we send it back and tell them to vacate the award? Correct. If we disagree with you that monitoring fees are permissible, there's no need to send it back for further specificity? I think that's a secondary argument, Your Honor, because I do believe that that language used by Judge Windmill, a key role, doesn't satisfy the required specificity of what hours or what tasks were contributing to that key role. Well, later in the order he goes and cuts the time down. He seems to, like he itemizes December, it's 5.4 hours, January it's this. I mean, it looks like he's then given a pretty specific explanation of how he got to where he got and what more we'd ask him to do. Do you have any? I suppose it would just be a request that there be more explanation of how or what hours specifically contributed to the drawdown. But, again, that's a secondary issue. The primary argument or the sole argument is really that there is no entitlement to any fee by the class for the unsuccessful motion. I think you're arguing or argued before when I asked you about this that the drawdown was not brought about by the motion. The motion did not cause the drawdown. We were doing it and would have done it that fast anyway. Is there something in the record to support that proposition? Well, what is in the record is simply the statistical breakdown or the numerical count each day showing that there was a consistent reduction in those numbers. And, again, that number was already down 25% at the time they filed their motion and was completely eliminated as of January 29th, which was more than 20 days prior to the contempt proceeding even occurring. So at a minimum at that point, as of January 29th, there was no- The fact that it's eliminated before the contempt proceeding, that strikes me as hurting your case as much as it helps it. It could be read either way. If somebody is trying to hold you in contempt because you're doing something contrary to a court order, bringing yourself into compliance before you have to stand up in court and defend yourself is the right way to go. It's the best tactic. And at that point, when the plaintiffs then initiated to proceed, it hurt them just as much by continuing on with the case. I don't know. What I'm really looking for is ideally a judicial finding or failing that as some clear evidence in writing that the state of Idaho recognized it was out of compliance and would have brought itself into compliance just as rapidly without any action by the attorneys for the plaintiff class. In the contempt motion, Your Honor, or excuse me, the contempt order by Judge Windmill, there is a statement in there that he did find that there was never any pretext by the state to house those inmates, to double house those inmates in those affected cells, and that once the riot occurred, there was no evidence that they had pretexted. That was the statement used by Judge Windmill. I don't understand what it means. That there was no sort of premeditated plan for the defendants to continue to house the inmates in those cells. I had read this differently. When I read that in his order, I thought what he meant was the state didn't really mean to violate the decree because it was simultaneously trying to build additional space for the prisoners and cancel the contracts that required the state to send checks to this private prison outfit in Texas or somewhere. And the construction delays and whatnot just made those plans not work out. He was letting the state off the hook because it planned to do right rather than to violate the decree and failed to do right accidentally rather than on purpose. You're saying there's some other way to read that? Well, I think there's a second sentence in that same paragraph where he does say that once those beds were double occupied, there was no plan and there was no evidence that the board intended to keep those beds occupied. In other words, all along, which is consistent with the board's actions, they advised the court, advised plaintiff's counsel that this riot occurred, we're having to temporarily house people in these double bunks, but we are working as expeditiously as possible to draw them down. Would you want to reserve some time, sir? I would if I may reserve my time. You've got about a minute and a half. Thank you. Thank you. Good morning. Good morning. May it please the Court, my name is Jason Prince. I'm with the law firm of Stoll Reeves, LLP, and I'm representing the appellees in this case, the Bala class. I'd like to start by just clarifying the standard of review because in the state's opening brief, the state suggests in its standard of review section that essentially this is a de novo standard of review for all issues on appeal. And as the panel has just pointed out, the state has actually raised a series of attacks on the factual findings of the district court, and that, of course, is not subject to de novo review. That would be subject to clear error review. And then the court's overall finding as to the reasonableness of the attorney's fees incurred is subject to an abuse of discretion review. And the Ninth Circuit, as it explained in prison legal news, provides such deference to the district court because it's appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what are essentially factual matters. And this is a perfect example of why that standard of review is important, because on the legal question of whether you can get fees arising from a contempt hearing that results in no finding of contempt, that would be something we would review de novo, wouldn't it? That's correct, Your Honor. Let me ask you about the finding that I read aloud before the Judge Windmill issued. Plaintiffs played a key role in monitoring and working with IDOC to resolve the overcrowding. What does the record show? I'm not asking what actually happened in your personal experience. What does the record show was done to play a key role in monitoring and working with the IDOC? The record will show that beginning in mid-December, the BALA class counsel learned through the Idaho Statesman, which is a local newspaper, that the state planned on bringing roughly 300 inmates from a Texas facility back to an already crowded ISCI, Idaho State Correctional Institution. And it was at that point that the BALA class counsel realized that that implicated the BALA injunctive relief, which had been entered in the 1980s. Not only, I mean, the general gist of the BALA injunctions and what it was trying to target was the overcrowded conditions at ISCI. So the fact that 300 inmates were being brought back to that facility was cause for concern. It also, in that article, indicated that the... Let me ask you, what did you do to play a key role? I understand, okay, this came to your attention through a newspaper article. Yes. Okay, what did you do to play a key role? So as soon as that came to the BALA class counsel's attention, the BALA class counsel contacted the state by a letter, raised the concerns, specifically citing the different injunctions or provisions in the BALA injunctions that were implicated by the state's plans. They then met face-to-face with the state and, again, expressed concerns. The state provided various assurances of measures that would be taken to alleviate BALA class counsel's concerns, only to, over the course of the next two to three days, come back and say, well, we said we were going to provide two plumbing trailers at this converted upholstery shop. In actuality, we're only going to have one ready. And then as it turned out, neither of the trailers were ready on the night the inmates were moved in. They also claimed that there would be two additional medical staffers that would be provided to accommodate these 300 inmates, only to turn around in a few days and say, well, actually, no, we're not going to provide any of those medical staffers. And this is what the record shows? Yes, Your Honor. And at that point, from BALA class counsel's perspective, it was a recipe for disaster. They were talking about moving inmates into a converted upholstery shop that wasn't finished. And sure enough, there was ultimately a riot the very first night the inmates were moved in. So once the riot took place, BALA class counsel then played a very active role in trying to find out what had happened. They gave them toilets. They gave them no toilets. The prisoners rioted. There were supposed to be two trailers. Did you get the toilets? The trailers were toilet trailers, right? Toilets and I believe showers and sinks. Trailer and there's running water and stuff. Yes, and neither of those trailers were available. They were supposed to be two. Did the trailers come before you filed your motion or after you filed your motion? Sorry, the provision of the trailers? Yes. The Unit 24 following the riot was determined by the state to be completely unsuitable for housing. I don't know if you heard my question. Were the trailers with the toilets provided to the prisoners before class counsel filed the motion for an order to show cause or after class counsel filed the motion for an order to show cause? It was after the motion was filed, Your Honor. And so given all of those issues, ball class counsel went out and conducted a tour of the Unit 24 facility to determine the extent of the damage to see if they could verify the state's claims that they had no choice but to double sell inmates in violation of the population caps. Ball class counsel also engaged in an off-the-record meeting in Chief Judge Windmill's chambers with the state. You're at this point telling the story of what happened, but we have particular questions about it. And the fundamental question is whether the motion accomplished something or whether it was just unnecessary and a waste of time. So I'm more interested, and my colleagues will ask their own questions, in what your motion did. Why don't you lose on the attorney's fees because you asked for some sanctions and the judge said, nope, you're not entitled to them? So as an initial matter, the state tries to portray all of the post-judgment monitoring enforcement work at issue as all related to the contempt motion. And that certainly wasn't the case. The steps we've been walking through right now were all prior to the contempt motion, and every effort was being made to have to avoid needing to file the contempt motion because the hope is that they would voluntarily come back. I'm kind of lost in all these words. You keep talking about how nice and reasonable and what good fellows the class counsel attorneys were. I don't care. If they're mean, nasty fellows, I don't care. All I care about is whether the motion accomplished something. Yes, Your Honor, and as you correctly pointed out, the motion certainly helped speed up the process. There have been repeated statements. What is the record established to show that the motion caused them to provide the toilets and the adequate other facilities faster than they otherwise would have? Well, the record shows that repeatedly there were claims made that they would try and come back into compliance with the population caps by March 1st, and it was only after the motion was filed that, as you pointed out, lo and behold, suddenly they came back into compliance in a much shorter period of time. I already knew that. Is there anything else? In terms of how the motion contributed to what came about, certainly the motion, again, sped up the compliance and the level of communication because there were issues of requesting information from the state that was not provided, and then suddenly there was more communication. Now let me get back to the other question I had. Why don't you lose on attorney's fees for the motion for an order to show cause and for sanctions because the judge denied sanctions? He could have granted sanctions for the period during which they were out of compliance, but he didn't. So starting with the case law, in prison legal news, this Court confirmed the Ninth Circuit's longstanding precedent that was established under Keith that once a party prevails in establishing a constitutional violation, an injunctive relief is entered, that that prevailing party status carries forward. And, of course, once there's post-judgment monitoring and enforcement work, that post-judgment monitoring and enforcement work under Section 1988 still has to be reasonable. So, in other words, it's not a blank check. There's some reasonableness to it. And the Ninth Circuit in prison legal news confirmed that that's the case. So then you have to turn to the next part of the analysis, which is, did the Prison Litigation Reform Act change that analysis? In other words, did Section 1997 ED1 narrow the ability? It doesn't matter if your contempt motion failed or succeeded because you were properly monitoring and that was a part of monitoring. That's correct, Your Honor, and the monitoring was found by the Court to be reasonable. And under the PLRA, that analysis doesn't essentially change. It's still a question of under Subpart A of Section 1997 ED1, the question is, was there an actual constitutional violation that was proven? And in this case, it's undisputed that there was an actual constitutional violation proven in BALA 1, BALA 2, BALA 3. A permanent injunction was entered, and that permanent injunction has been in place for roughly 25 years. So, at this stage, we're now moving to Subpart B, Romanet 2, which asks, was the post-judgment monitoring and enforcement work directly and reasonably incurred in enforcing the BALA injunctions? So, as a factual matter, Chief Judge Windmill found that it was directly and reasonably incurred in enforcing the BALA injunctive relief. And so, legally, there was no requirement, and there is no requirement under Ninth Circuit law, that there be a step. Well, there really isn't any question that Ninth Circuit law allows attorney's fees for monitoring. The issue is whether it allows attorney's fees for a motion that is denied. Yes, and in Prison Legal News and Keith, it was established that you don't have to show new judicially sanctioned relief. And Keith actually expressly says there does not need to be a finding of contempt or obstruction of implementation. There simply needs to be a showing that you're preserving the fruits of the existing injunctive relief and that that preservation and the efforts taken to preserve are reasonable. I may have misunderstood, Mr. Kubinski. I'm not sure. Were you at all times prior to the start of this, I don't mean you personally, but the plaintiff's counsel, were you at all times appointed as monitors? Yes, Your Honor, and Chief Judge Windmill made that clear on page four of the order awarding attorney's fees when he said, this court had previously appointed Stowe Reeves for the specific purpose of monitoring the injunctive relief in the BALA cases. And so it was clear certainly to the court, clear to the BALA class counsel, and quite frankly given how active and involved BALA class counsel was in interacting throughout this process with the state, it had to have been clear to the state that that was the role that BALA class counsel was playing. So there was no question that BALA class counsel had been appointed to monitor, and that is in fact what they did. They diligently performed and carried out the court's instructions to monitor the case during a time of crisis at ISCI. You had been appointed well before this to monitor, not as counsel, but for your monitoring? So initially BALA class was appointed as class counsel, and that was part of the state's second motion to terminate the BALA injunctive relief. The state's first motion to terminate the injunctive relief, Stowe Reeves was appointed as class counsel. They prevailed. Then the state filed 18 months later another motion to terminate the injunctive relief and then withdrew that motion. And at that hearing where the state withdrew the motion, Chief Judge Windmill stated, you know, it doesn't make sense to have class counsel on again, off again, as you keep trying to terminate this relief. I'm just going to appoint class counsel to stay involved in this case, and expressly said, and to monitor this case going forward. And so based on that, the court understood, and BALA class counsel understood, that that was the role that was to be played, and that is the role that was played. Yeah, sometimes maybe it's a semantic thing. I've seen prison cases where they have counsel, and then there's also a special master who goes down there every week to check on whatever they're supposed to check on. But you were appointed as a monitor. We were appointed as class counsel and expressly instructed that our job was to monitor the injunctive relief. Fair enough. So getting back to that three-part, or the Section 1997ED1, the state did not raise that argument before the district court, the argument that it's actually a three-element test where you have to show, you have to satisfy Subpart A and Subpart B Romanet I and Subpart B Romanet II. Now, first of all, that argument ignores the fact that Subpart B Romanet I and Subpart B Romanet II are separated by the word or. So it's very clear that it's A and B, and within B it's Romanet I or Romanet II. So the state is raising a new argument, and it's an argument that this court expressly considered and rejected in Webb. In Webb, Ada County made a virtually identical argument that the inmates had to establish both Subpart A and Subpart B as the post-judgment monitoring, in other words, saying that if there's post-judgment monitoring for each and every action that's taken to monitor and enforce, there has to be some sort of new actual proof of a constitutional violation, and there has to be a new judicially sanctioned form of relief. And the Ninth Circuit rejected that and said that would render Subpart B Romanet II superfluous, because the question is, did, in the first instance, the plaintiff class establish actual constitutional violations that gave rise to injunctive relief? And then once that injunctive relief was entered, then you move to Subpart B Romanet II to determine whether all of the post-judgment monitoring enforcement was directly and reasonably incurred in enforcing that injunctive relief. So there are limits placed on attorneys' fees, the award of attorneys' fees for post-judgment monitoring, and Chief Judge Windmill was aware of that. He cited to Section 1997-81 in his brief. He cited to Webb in his order. And knowing that that was the standard, he reached key findings of facts, including that the BALA class played a key role in enforcing and monitoring the conditions at IDOC to resolve the overcrowding that arose in January 2009. And then he also found that it was undisputed that overcrowding conditions existed at ISCI for that period of time, so that the state was in violation of the BALA injunctions. And, again, he pointed out that the BALA class had been specifically appointed to monitor this type of situation. And, as he said, the State of Idaho should not be surprised that attorneys appointed to represent the new class representatives have incurred fees monitoring compliance and bringing motions when there's need for clarification or to ensure injunctive relief. Thank you, Mr. Print. Thank you. Mr. Kavinsky, back to you, and I think you've got about a minute and change. Thank you. There is no case that either party has cited, or of which I am aware, in which a post-judgment enforcement case under the PLRA, which results in a completely unsuccessful motion, justifies an award of attorney's fees. And that's the situation, the issue that is before this Court. PLN and Keith were not PLRA cases, nor were they contempt cases. Those cases had to do with ongoing monitoring regarding the implementation of consent decrees or settlement agreements. That's not what we're dealing with here. In this instance, what we're dealing with is an offensive motion filed by the plaintiff class, as opposed to in some of the other cases in which the institution or the defendant sought to terminate a consent decree or terminate some sort of an injunction, and the plaintiffs were required to defend those. In this instance, that didn't exist. In this instance, the plaintiffs chose to proceed by filing a contempt motion. They were entitled to make that choice. But once they did, they also bought the risk of that, and that was if they did not succeed on that motion, they would not be entitled to attorney's fees. From Hensley on down, the U.S. Supreme Court has made it very clear that you have to achieve some sort of successful result to be awarded attorney's fees. That did not occur in this case. And at a very minimum, to the extent any fees were justified, the degree of success is the foremost factor to look at in determining the reasonableness of those fees. Here, there was no success, and so any award of fees would be unreasonable. Thank you. Thank you very much, gentlemen. The case just argued is submitted and will stand in recess for today. All rise.
judges: Beezer, Kleinfeld, Silverman